United States District Court
District of Massachusetts

| | |
|---|---|
| **United States** | ) |
| | ) |
| v. | ) |
| | )   No. 04-CR-10214-GAO |
| **Mohamed Hamade,** | ) |
| **Defendant.** | ) |
| | ) |

**Defendant Hamade's Memorandum of Law
in Support of Motion to Suppress Statements**

Defendant Mohamed Hamade submits this memorandum of law in support of his Motion to Suppress Statements. As explained below, this Court should suppress any statements Hamade made to immigration inspector James Bratton during his secondary immigration examination on January 10, 2004, because those statements were made during a custodial interrogation without the benefit of *Miranda* warnings.

**Factual Background**

On January 10, 2004, Mohamed Hamade arrived at New York's JFK Airport at approximately 4:21 p.m., on Olympic Airlines flight 411, from Athens, Greece. Hamade, a returning lawful permanent resident ("LPR"), was met at the gate by two Customs and Border Patrol ("CBP") Inspectors and escorted to the CBP inspection area. Tr. 4:70; Exhibit 1.

Accounts differ as to whether Hamade was escorted immediately to the secondary CBP area, or whether he first went through primary inspection. James

Bratton ("Bratton"), the immigration inspector who conducted the secondary examination, testified at the first trial that Hamade underwent a primary inspection. Tr 2:17. Hamade, however, testified that he was brought directly into the secondary area, and one of Bratton's reports also indicates that this was the case. Tr 4:70, 73-74; Exhibit 1.

Bratton, following his normal routine, had logged onto a system called TECS when he arrived at work earlier that day. Through that system, CBP officers are alerted as to whether the National Target Center has any particular interest in a person who is expected to arrive at the airport that day. Such messages are referred to as "lookouts" and are accompanied by something called a NAILS record. Bratton learned that day of the Joint Terrorism Task Force's interest in Hamade through lookouts posted by Special Agents Greg Nevano and Harry Gallagher of Immigration and Customs Enforcement ("ICE"). Hamade was listed on the TECS's Suspect and Violaters Indices as a "Suspected Terrorist." Exhibits 2, 3, & 4. According to two of the documents' remarks sections, "[p]orts of entry should place subject in secondary," and the ICE agent issuing the document was to be contacted upon Hamade's arrival. Exhibits 2 & 3. The third record noted: "Special Case—Do not detain." Exhibit 4.

Upon encountering Hamade in the secondary inspection area, Bratton proceeded to review his documents and conduct the secondary examination. Bratton noticed that Hamade had a valid, unexpired green card, giving him permanent resident status in the United States, and that Hamade had left the

United States for his trip to Greece approximately two weeks earlier, on December 27, 2003. Tr 1:122. During his interview with Hamade, Bratton asked whether Hamade's spouse lived in Greece, and then continued to question him about his daughter and the nature of his relationship with his daughter's mother. Tr 1:130. Other questions included: "whether his travel documents belonged to him . . . about the length of his absence outside the United States, the reason for his travel, and whether . . . he was accompanied by his spouse. Or anybody else. And what was his intended destination at that time." *Id.* During the process, Bratton called SA Nevano, as the TECS document required, and SA Nevano returned his call promptly. Tr 1:132. Though Bratton could not recall the exact length of time of Hamade's secondary examination, he testified at the first trial that he knew Hamade was there for "an hour or so." Tr 2:41. After Hamade completed the secondary examination, "he was escorted out of immigration, out of the secondary area, by the officers who escorted him there." Tr 1:133.

## Legal Argument

"*Miranda* warnings must be given before a suspect is subjected to 'custodial interrogation.'" *United States v. Taylor*, 985 F.2d 3, 7 (1st Cir. 1993) (citing *United States v. Maguire*, 918 F.2d 254, 262 (1st Cir.1990)). This warning must advise the suspect that "he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney, one will be appointed for him prior to any questioning if he so desires." *Miranda v. Arizona*, 384 U.S. 436, 479 (1966). To

determine whether a defendant was in custody at the time of interrogation, a court must apply an objective test, asking whether "a reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave." *Locke v. Cattell*, 476 F.3d 46, 51 (1st Cir. 2007).

The First Circuit has held "that even secondary [immigration or Customs] inspection does not *per se* constitute custodial interrogation." *United States v. Ventura*, 85 F.3d 708, 711 (1st Cir. 1996) (citing *United States v. Pratt*, 645 F.2d 89, 90-91 (1st Cir. 1981). The court has also recognized, however, that "[t]he line between routine Customs [or immigration] questioning and custodial interrogation is not easily drawn [and] requires careful examination of all the circumstances." *Ventuara*, 85 F.3d at 711. In conducting this analysis, the court has looked to whether the questioning was of a "routine nature," how "limited" the scope of the questioning was, and the "duration of the encounter." *Id.* (citing *Pratt*, 645 F.2d 89).

An evaluation of all the circumstances of Hamade's secondary examination reveals that the encounter was a custodial interrogation for *Miranda* purposes. First, the encounter was far from routine. Bratton did not conduct the secondary inspection because there was any question about whether Hamade was entitled to admission to the United States as a returning LPR. Instead, the only reason he conducted the secondary inspection was because the TECS lookout identified Hamade as "Suspected Terrorist" and instructed him to "place [Hamade] in secondary." Exhibit 2. The lookout also advised Bratton that this was a "special

-4-

case" and that Bratton should "not detain" Hamade. Exhibit 4. There was no question when this inspection began that Hamade would be admitted into the United States. The only purpose of the inspection was to assist in conducting a terrorism investigation. This was not a routine immigration inspection. Rather, it was, as the lookout explained, a "special case." *Id.* The examination was also not routine because Hamade was met at the gate by immigration officials when he arrived in New York, was specially escorted to the examination area, and was then escorted out of the secondary inspection area after his examination was completed.

Second, the examination was not limited in scope. A returning LPR is not treated as an applicant for admission to the United States "unless he [falls] under one of six exceptions:

> '(i) has abandoned or relinquished that status,
>
> (ii) has been absent from the United States for a continuous period in excess of 180 days,
>
> (iii) has engaged in illegal activity after having departed the United States,
>
> (iv) has departed from the United States while under legal process seeking removal of the alien from the United States, including removal proceedings under this chapter and extradition proceedings,
>
> (v) has committed an offense identified in section 1182(a)(2) of this title, unless since such offense the alien has been granted relief under section 1182(h) or 1229b(a) of this title, or
>
> (vi) is attempting to enter at a time or place other than as designated by immigration officers or has not been admitted to the United States after inspection and authorization by an immigration officer.'"

*Onwuamaegbu v. Gonzales*, 470 F.3d 405, 410 (1st Cir. 2006) (quoting INA § 101(a)(13)(C), 8 U.S.C. § 1101(a)(13)(C)).  Unless a returning LPR fits under one of these exceptions, he or she is entitled to enter the United States in the same manner as a United States citizen.  Had Bratton's examination been routine, it would have been limited to a determination of whether Hamade fell under one of these exceptions.

Bratton's actual examination, however, exceeded this scope.  Bratton questioned Hamade about his relationship with the mother of his daughter in Greece, and this questioning resulted in the statements that are relevant to the charges in this case—i.e. that he was previously married to his daughter's mother.  This questioning was outside the scope of a routine immigration examination for a returning LPR.  Because Bratton's questions about Hamade's relationship with his daughter's mother had nothing to do with the determination Bratton had to make—whether Hamade fell within one of the six exceptions outlined above—the scope of the examination was not consistent with a routine immigration examination.

Third, the duration of the encounter does not "support[ ] a characterization of routine [immigration] inquiry rather than custodial interrogation."  *Pratt*, 645 F.2d at 91.  In *Pratt*, the First Circuit found that a secondary inspection lasting "about 15 minutes" was of a duration associated routine customs inspection, not custodial interrogation.  *Id.* at 90, 91.  Here, by contrast, an immigration official questioned Hamade for approximately one hour, even though there was no reason to think that

he was not entitled to enter the United States as a returning LPR.  In fact, Bratton likely extended the examination by calling SA Nevano in the middle of it—something that is surely far from routine.  The duration of this interview was consistent with a custodial interrogation aimed at gathering information for the terrorism investigation, not with a routine immigration inspection limited to determining Hamade's eligibility for reentry into the United States.

The totality of the circumstances surrounding Hamade's January 10, 2004, secondary examination demonstrates that this examination was a custodial examination, rather than a routine immigration interview.  Bratton was therefore required to give Hamade *Miranda* warnings before conducting the examination.  Because he failed to provide these warnings, all statements allegedly made by Hamade during the examination should be suppressed.

## Conclusion

For all of the above reasons, Mohamed Hamade requests that this Court suppress any statements he made during his secondary immigration examination on January 10, 2004.

Mohamed Hamade
By his attorneys,

/s/ John Salsberg
John Salsberg
B.B.O. No. 439300

/s/ Ryan M. Schiff
Ryan M. Schiff
B.B.O. No. 658852

SALSBERG & SCHNEIDER
95 Commercial Wharf
Boston, MA 02110
(617) 227-7788

Dated: April 26, 2007

## Certificate of Service

I hereby certify that I have served this motion on the government and all counsel of record by e-filing.

/s/ Ryan M. Schiff
Ryan M. Schiff
