UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES ) | |
| ) | |
| v. ) | Cr. No. 04-10214-GAO |
| ) | |
| MOHAMED HAMADE ) | |

## GOVERNMENT'S MEMORANDUM IN OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS

The United States of America, by Michael J. Sullivan, United States Attorney, and Kimberly P. West and Aloke S. Chakravarty, Assistant United States Attorneys for the District of Massachusetts, hereby submit its <u>Memorandum in Opposition to Defendant's Motion to Suppress</u> ("Motion") filed by Defendant Mohamed Hamade ("Defendant") on April 26, 2007. The Defendant's motion should be denied[1] as the state of law regarding the issue of custodial interrogations in the context of United States Customs interviews does not favor suppression on these facts. Furthermore, no hearing on this matter is required as the factual elements required for the Court to make a informed decision were elicited at the first trial.

**I.    FACTS**

United States Customs and Border Protection ("CBP") Agent James Bratton ("Bratton") testified on April 18 - 19, 2006 and was subject to cross examination.  Bratton testified that during his 11 years as an officer with CBP he had various assignments all regarding the

---

[1] This motion was filed approximately one year after the first trial.  Although the transcripts were not available immediately, they were available by the end of November 2006.  Consequently, this motion should be denied as untimely and as waived pursuant to Fed.R.Crim.P. 12(e).  Rule 12(b)(3)© requires that a motion to suppress be raised before trial.  Rule 12(e) provides that "[a] party waives any Rule 12(b)(3) defenses, objection, or request not raised by the deadline the court sets under Rule 12© or by an extension the court provides." Fed.R.Crim.P. 12(e).  Rule 12(e), however, does allow a court to grant relief from the waiver "[f]or good cause."

determination of admissibility of arriving passengers at JFK International Airport in New York. (Tr. I, p. 111).[2] Bratton testified that has interviewed passengers arriving from foreign ports as both a primary screener and in secondary inspection. (Tr. I, p. 113). He indicated that secondary inspection involved more in-depth interviews of arriving passengers. (Tr. I., p. 113-14). Bratton testified that the sole goal of the interview was to determine whether or not the passenger would be allowed to proceed, or pass immigration inspection and be admitted to the United States. (Tr. I, p. 114).

**Public Area**

Bratton described the secondary area at JFK in January 2004 as having available seating for a maximum of 15 to 20 people. (Tr. I, p. 116). He said that the primary area is too large to perform any type of in-depth exam. (Tr. I, p. 116). Bratton described the secondary area as standing room only and as very busy. (Tr. I, p. 117). He agreed that it was something akin to 20 feet by 20 feet and had security cameras monitoring it. (Tr. II, p. 21). It was first come, first served and typically had 15 - 20 people waiting at any time to be interviewed. (Tr. I, p. 117-18).

**Routine Questions**

Bratton testified that there were standard questions that he would ask anyone he interviewed in secondary:

> Q: And during the secondary examination, are there standard questions that you ask anyone who is getting a secondary?
>
> A: Yeah. Again, you welcome the person to the United States, you proceed through a series of questions based on the status that the person is applying for. If they're applying as a returning resident, you ask them certain questions about the length of absence outside the United States; if

---

[2] The transcript from April 18, 2006 will hereafter be cited as Tr. I. The transcript from April 19, 2006 will hereafter be cited as Tr. II.

> they are any traveling companions that's accompanying them, the status
> which they are entitled to. You ask them certain questions about their
> employment, if it's an employment-based application. If it's a
> relationship, such as a marriage application, they got their status through a
> marriage, you ask them certain questions about things of that nature.
>
> Q: And how do you determine what questions you're going to ask?
>
> A: Based upon how long they were –how long they were abroad. Their
> travel document, their ticketing, the entries, previous entries in their
> passport.

(Tr. I, p. 119). Bratton explained that he typically had no ulterior motives when he asked these questions; he just tried to establish admissibility to get the passenger on his way. (Tr. I, p. 120).

The time of day that the Defendant came to secondary was very busy and the Defendant likely waited for a while before he was interviewed. (Tr. I, p. 121-22). Bratton first saw the Defendant when he was next in line and Bratton picked up the Defendant's travel documents to process him. (Tr. I, 121). From his travel documents, Bratton noted that the Defendant was absent from the United States for about a month prior to his arrival, that he was coming from Greece, and that he was a lawful permanent resident based on marriage. (Tr. I, p. 122). Bratton asked the Defendant how long he had been gone and the purpose of his travel. (Tr. I, p. 129). The Defendant said that he was visiting his daughter in Athens, Greece. (Tr. I, p. 129). Bratton asked if the Defendant had traveled with his spouse and the Defendant indicated that he had not. (Tr. I, p. 130). Bratton asked whether his spouse lived in Greece and the Defendant said that his ex-wife lived in Greece, but his current wife lived in Massachusetts. (Tr. I, p. 130). Bratton also testified that it was standard practice to ask anyone appearing in secondary whether they are traveling with other people. (Tr. II, p. 54). He noted that a spouse seemed to be a logical person with whom someone would travel when they travel outside the country for vacation. (Tr. II, p.

55).

Although Bratton conceded during cross-examination that, in fact, the Defendant had been gone for only about two weeks not one month, (Tr. II, p. 53), Bratton explained that the period of time only mattered if the Defendant had been in the process of applying for a benefit from immigration. (Tr. II, p. 78). In the case of the Defendant, since he was a lawful permanent resident, any absence over a year or more would affect his status when he re-entered the United States, however, anything less would not impact Bratton's decision to re-admit him. (Tr. II, p. 53). Bratton concluded that although the Defendant had been previously married, it was not material to the defendant's status as a returning permanent resident because it was the wife who lived in the United States that was the vehicle by which the Defendant gained his status. (Tr. I, p. 130). Bratton testified that "all [his] intention was to find out, whether or not [the Defendant] was entitled to enter as a lawful permanent resident." (Tr. I, p. 130). Bratton testified that the traveler must show that they are entitled to re-enter the United States under the classification they claim, in this case, as a permanent resident alien. (Tr. II, p. 36).

**Bratton's Knowledge of TECS Information Played no Part in the Questions Asked**

Although Bratton was aware of the documents attached to defendant's motion at Exhibits 2, 3, and 4 during the course of his interview of the Defendant, none of the information included in those documents prompted him to ask the Defendant questions about the defendant's travel, where he had been or to whom he had been married. (Tr. II, p. 82-83.) The information did not bear on Bratton's judgment or the purpose of his interview; Bratton only knew that a secondary examination needed to be done. (Tr. II, p. 83). Bratton contacted the immigration agent in Boston who had an interest in the Defendant, but was only asked to relay the results of his

examination. (Tr. I, p. 132-133). The agent also asked Bratton to send him a copy of the documents that Bratton copied from the Defendant. (Tr. I, p. 133). Bratton had no contact with the agent prior to the defendant's arrival and when he spoke to the agent during the interview, the agent did not discuss the nature of the agent's investigation with Bratton. (Tr. II, p. 43). Bratton never knew any of the facts of the criminal investigation of the Defendant. (Tr. II, p. 44). Finally, Bratton had another conversation with the Defendant after the telephone call, and then the Defendant was escorted out of the secondary area and the interview was concluded. (Tr. I, p. 133).

## Length of Interview

Although the Defendant's flight was scheduled to land at JFK at 4:00 p.m., Bratton did not know the exact time it had arrived on that day. (Tr. II, p. 35). Bratton testified that normally a secondary examination takes anywhere from 5 minutes to 2 hours. (Tr. II, p. 41). Bratton believed that the Defendant was there for maybe an hour or so. (Tr. II, p. 41). Although Bratton wrote a report on his interaction with the Defendant that was faxed to the agent at 7:00 p.m. that evening, (Tr. II, p. 45), Bratton testified that he did not write the report immediately and could have written it hours after the Defendant's processing, but it was Bratton's practice to do it on the same day. (Tr. II., p.60, 80).

**II.    LAW**

In United States v. Ventura, 85 F.3d 708 (1st Cir. 1996) ("Ventura I"), the Court of Appeals for the First Circuit held that to find custodial interrogation in the context of a United States Customs interview, the court "must first examine all the circumstances surrounding the exchange between the government agent and the suspect, and then determine from the

5

perspective of a reasonable person whether there was 1) a formal arrest or restraint on freedom of movement of the degree associated with formal arrest and 2) express questioning or its functional equivalent." Ventura, 85 F.3d at 712. Although the First Circuit focused on the limited and routine nature of questioning and the short duration of the encounter as factors in the determination of custody in the first appeal in Ventura, the second appeal in Ventura was more illustrative of how these factors applied to the Ventura facts and United States Customs interviews generally.

In United States v. Ventura, 132 F.3d 844 (1st Cir. 1998) ("Ventura II"), the First Circuit emphasized that the examination must take into "account the strong governmental interest in controlling our borders." Ventura II, 132 F.3d at 846, citing United States v. Moya, 74 F.3d 1117, 119 (11th Cir. 1996). "[Q]uestions from [Customs] officials are especially understood to be a necessary and important routine for travelers arriving at American entry points. This understanding cuts against the potentially coercive aspect of the Customs inquiry, and lessens the need for Miranda warnings." Ventura I, 85 F.3d at 711 (citations omitted). In addition, Ventura II cited the Moya court again noting that "events which might be enough to signal 'custody' away from the border will not be enough to establish 'custody' in the context of entry into the country." Ventura II at 846.

In United States v. Moya, the TECS database alerted inspectors at the Miami International Airport that the defendant was a match and may have been deported before. When the defendant arrived, he was referred to the secondary area and was questioned by an immigration inspector to whom the defendant said he was entering the United States to see his family, denied ever having been deported, admitted he was not a United States citizen, and said

that he did not use aliases.  In finding that the defendant's interview was not custodial, the court noted that its conclusion was "buttressed by the case law in this circuit explaining that whether interrogation is 'custodial' should be interpreted in light of the strong governmental interest in controlling our borders."  Moya, 74 F.3d at 1119.  See also United States v. Lueck, 678 F.2d 895, 899 (11th Cir. 1982)("Interrogation at the border constitutes one notable exception to the constitutional protection of Miranda.  Because of the overriding power and responsibility of the sovereign to police national borders, the fifth amendment guarantee against self-incrimination is not offended by routine questioning of those seeking entry to the United States.")

With these national concerns in mind, the Ventura II court indicated that even when a passenger goes straight to secondary, the total time the passenger has to spend in Customs is more likely reduced and "makes the questioning less coercive, not more."  Id.  In addition, other arguably custodial inducing factors in Ventura II, like the presence of four armed officers during the interview, did not make the interview custodial.  Id.  Nor did the length of time of the questioning in Ventura II: one hour and twenty minutes.  Id. at 848.  The First Circuit found that time was never a uniquely dispositive factor and that one hour and twenty minutes was not extraordinary.  Id.

A survey on the relevant case law nationwide illustrates that United States Customs interviews are typically found to be non-custodial.  In the most recent case, United States v. Kiam, 432 F.3d 524 (3rd Cir. 2006), the Court of Appeals for the Third Circuit even rejected the notion that whether "routine questions" were the subject of the interview was a dispositive factor regarding the interview's custodial nature.  Kiam, 432 F.3d at 529-30.  Instead, the Court held that where the inspector's "questions objectively cease to have a bearing on the grounds for

admissibility and instead only further a potential criminal prosecution" then the interview becomes custodial. The Court noted that "attempting to force these cases [U.S. Customs interviews] into the rubric of 'routine' questioning . . . ignores the very real issues of border immigration practices." Id. at 531.

Furthermore, the majority of other Circuits have repeatedly upheld the authority of immigration inspectors to question aliens without Miranda. See Ventura II, discussed supra, United States v. Silva, 715 F.2d 43 (2d Cir. 1983) (even after defendant detained beyond secondary questioning and immigration inspector already understood that defendant lied about her nationality, subsequent questions from customs official did not require Miranda); United States v. Bengivenga, 845 F.2d 593 (5th Cir. 1988) (even after defendant taken off bus for questioning and brought to small trailer for further questioning, no custody found); United States v. Galloway, 316 F.3d 624 (6th Cir. 2003) (defendant singled out for questioning after canine alerted to drugs, routine questioning in secondary did not require Miranda); United States v. Gupta, 183 F.3d 615 (7th Cir. 1999) ("A person seeking entry into the United States does not have a right to remain silent; the immigrant must honestly describe his identity, nationality, business, and claim of entitlement to enter, and must do this without the aid of counsel. The United States is entitled to condition entry on willingness to provide essential information. No information, no entry); United States v. Layne, 973 F.2d 1417 (8th Cir. 1992) (questioning in secondary location regarding defendant's criminal history not custodial); United States v. Hudson, 210 F.3d 1184 (10th Cir. 2000) (routine stop at fixed border checkpoint is not custodial even where purpose in questioning was to substantiate be-on-lookout report concerning drug transactions, rather than to dissipate any suspicions arising purely out of interactions at

checkpoint); United States v. McDowell, 250 F.3d 1354 (11th Cir. 2001)(no fixed limit to length of questioning permitted to sustain questioning's non-custodial status (4 hours)).

Even where routine questions provide strong inculpatory evidence against the defendant, the First Circuit has maintained that the answer's criminal investigative value does not change the dynamic of the non-custodial setting. United States v. Tajeddini, 996 F.2d 1278, 1288 (1st Cir. 1993). Here, the Defendant was asked routine questions that happened to be inculpatory to the charges in the indictment.

The defendant cites Onwuamaegbu v. Gonzales, 470 F.3d 405, 410 (1st Cir. 2006), for a list of factors that would outline the parameters of routine questions. One of the factors is whether the traveler has "abandoned or relinquished the status" which allows for his entry into the United States. In fact, Bratton testified on this point directly, indicating that the purpose of the interview was to determine admissibility. See Tr. I, p. 114. In other words, the purpose of the interview was to determine whether the traveler has legitimate status in the United States allowing for his lawful entry. Here, before the interview and from his review of the documents, Bratton determined that the Defendant was a permanent resident based on marriage to a United States citizen. It was therefore not unusual that when the defendant indicated that he had traveled to Greece to visit his daughter, that Bratton would be interested in the defendant's relationship with his daughter's mother. This was particularly so when marriage was the basis for the Defendant's status in the United States. Bratton explained that once he understood that the daughter's mother was his ex-wife and that the Defendant's current wife lived in Massachusetts, then Bratton was comfortable that the defendant's status pursuant to marriage was legitimate. See Tr. I, p. 130.

That Bratton knew of the TECS information is irrelevant to the custodial inquiry. Bratton did not use the information to craft his questions that were clearly aimed at determining whether the Defendant was admissible. See Tr. II, p. 82-83. Indeed, Bratton never even knew the facts of the criminal investigation, see Tr. II, p. 44, so it is difficult to understand how he could have formulated questions that would have aided the investigation.

Bratton was with the defendant for about one hour. The defendant cites no case where this length of time should cause the court pause, indeed, both Ventura II and McDowell held that one hour and twenty minutes and 4 hours were not extraordinary period of time to be questioned in secondary.

Nor does the fact that the defendant was escorted into the secondary area change the dynamic. The defendant was in a public room with several other travelers, at a very busy time of day and was interviewed by only one immigration inspector. This scenario does not in any way resemble one in which a reasonable person would have thought he was constrained to a degree associated with formal arrest.

For the foregoing reasons, the government respectfully requests this Court deny the defendant's Motion to Suppress without a hearing.

                Respectfully submitted,

                MICHAEL J. SULLIVAN
                United States Attorney

By:   /s/ Kimberly P. West
       ALOKE S. CHAKRAVARTY
       KIMBERLY P. WEST
       Assistant U.S. Attorneys

Dated: May 9, 2007

CERTIFICATE OF SERVICE

      I hereby certify that these documents filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                              /s/ Kimberly P. West
                                              Kimberly P. West
                                              Assistant U.S. Attorney