UNITED STATES DISTRICT COURT FOR
THE DISTRICT OF MASSACHUSETTS


```
                                    )
UNITED STATES OF AMERICA,           )
                                    )
            Plaintiff,              )
                                    )   Criminal Action
                                    )   No. 04-10214-GAO
vs.                                 )
                                    )
                                    )
MOHAMAD HAMADE,                     )
                                    )
            Defendant.              )
                                    )
```


TRANSCRIPT OF JURY TRIAL
DAY ONE


BEFORE THE HONORABLE GEORGE A. O'TOOLE, JR.
UNITED STATES DISTRICT JUDGE


United States District Court
John J. Moakley U.S. Courthouse
1 Courthouse Way
Boston, Massachusetts  02210
April 18, 2006
9:00 a.m.


* * * * * *


SHELLY M. KILLIAN, RPR, CM, CRR
Official Court Reporter
John J. Moakley U.S. Courthouse
1 Courthouse Way, Room 3510
Boston, MA  02210
(617) 737-7117

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

1    APPEARANCES:

2    For the Plaintiff:

3        Kimberly P. West
         Aloke S. Chakravarty
4        United States Attorney's Office
         John Joseph Moakley Federal Courthouse
5        1 Courthouse Way, Suite 9200
         Boston, Massachusetts  02210
6
     For the Defendant:
7
         Vincent Bongiorni, Esq.
8        Law Offices of Vincent Bongiorni
         95 State Street
9        Springfield, Massachusetts  01103

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1-3

Page 3

1    EXAMINATION INDEX

2

JAMES BRATTON
3       DIRECT BY MR. CHAKRAVARTY . . . . . . . 110

4

5    EXHIBIT INDEX

6                                                    MAR  /  ADM
Government
7    1    Certified copy of Greek marriage    (By stipulation)
         certificate
1A   8
         English translation of Greek        (By stipulation)
9        marriage certificate

10   2    Certified copy of Greek             (By stipulation)
         certificate of family registry
2A   11
         English translation of Greek        (By stipulation)
12       certificate of family registry

13   3    Certified copy of Absense of        (By stipulation)
         divorce
3A   14
         English translation of Absense of   (By stipulation)
15       divorce

16   4    Passport                                      125

17   5    Passenger receipt and travel itinerary        126

18   5A   Customs declaration form                      128

19   6    Photocopy of commercial driver's              128
         license
20

21

22

23

24

25

Page 4

1                    P R O C E E D I N G S

2              (The following proceedings were held in open

3      court before the Honorable George A. O'Toole, Jr.,

4      United States District Judge, United States District

5      Court, District of Massachusetts, at the John J. Moakley

6      United States Courthouse, 1 Courthouse Way, Boston,

7      Massachusetts, on April 18, 2006.

8              The defendant, Mohamad Hamade, is present with

9      counsel.  Assistant U.S. Attorneys Kimberly West and

10     Aloke Chakravarty are present.)

11             THE CLERK:  All rise.  United States District

12     Court for the District of Massachusetts, court is now in

13     session.  Please be seated.  For jury trial in the

14     United States of America versus Mohamad Hamade, docket

15     04-10214.

16             Would counsel please identify yourselves for

17     the record.

18             MS. WEST:  Good morning, your Honor.  Kim West

19     for the government.

20             MR. CHAKRAVARTY:  Also for the government,

21     Aloke Chakravarty.

22             MR. BONGIORNI:  Good morning, Judge.  Vincent

23     Bongiorni for Mr. Hamade.

24             THE COURT:  Good morning.  We will probably

25     get jurors fairly expeditiously, so I wanted to address

Page 5

1      the motion in limine before we had a pool of jurors.

2            MR. CHAKRAVARTY:  May it please the Court,

3      your Honor.  Your Honor, last week I filed a motion

4      seeking clarification and also to limit how tangential

5      counsel's arguments and cross-examination may be in this

6      case in which there was at least one officer, an agent,

7      who was assigned to the Joint Terrorism Task Force.  He

8      happened to be an Immigration Customs and Enforcement

9      agent, Agent Nevano.  Because of his affiliation, there

10     is a possibility that counsel would attempt to explore

11     the Joint Terrorism Task Force mission and information

12     obtained by the JTTF, as it's so-called, in attempting

13     to advance a theory of defense in the case.  In

14     anticipation of that, I filed a motion in limine seeking

15     to keep that because it's such a collateral and

16     irrelevant matter to the issues at hand, seeking to

17     limit that.

18            Counsel, as you know, has responded and

19     indicated that, in fact, he does wish to explore that

20     line of questioning, primarily to go into the bias of

21     the government's witnesses, of the government's case,

22     and to elaborate on the nature of the government's

23     case.  The government's response to that, your Honor,

24     and because now it became a live issue and there was

25     actually an affirmative gesture indicating there is an

Page 6

1    intent to go down that road, consequently I did file a

2    voluminous -- apologetically -- a voluminous response,

3    but one that I think adequately and fairly characterizes

4    the state of the law.

5        Primarily there are three reasons, your Honor,

6    why counsel should not be permitted to explore the

7    connection to the Joint Terrorism Task Force, any

8    reference to terrorism, and those are: number one, it's

9    irrelevant to the indictment, your Honor.  The defendant

10   is charged with false statements on immigration

11   documents, not charged with any terrorist-related

12   offenses, not charged with anything implicating JTTF.

13       The second is, your Honor, under Rule 403 of

14   the Federal Rules of Evidence, that your Honor has

15   discretion and responsibility in the gatekeeper role to

16   weigh potential probative value of this information

17   versus the risk of unfair prejudice, which I would argue

18   in this case, your Honor, in light of just even the

19   nomenclature, the fact that we're saying terrorism in a

20   case that has to do with immigration, your Honor, would

21   immediately give indication that some juror may indeed

22   be very unfairly prejudiced.  It would be certainly

23   distracting to the jury, confuse the jury as to what the

24   issues are and what the defendant is currently charged

25   with.

Page 7

1          And if your Honor is not so inclined to

2     preclude that line of questioning and argument because

3     of those reasons, then because an honest and complete

4     response to some questions down that line of inquiry

5     would involve classified information, defendant has an

6     obligation to provide notice to the government and to

7     the Court that he intends to go down that road.

8     Assuming that that now has been done, the actual

9     parameters of that questioning have to be known so that

10    we can formulate and balance the intelligence equities

11    in determining, as the Classified Information Procedures

12    Act suggest, in determining what the next course of

13    evidence would be on behalf of the government.  It means

14    talking to the intelligence agencies, intelligence

15    equities in that information, predetermine whether it

16    may come in unclassified in a classified format.  All of

17    those decisions do require a considerable amount of

18    time.  And they're there specifically because CIPA was

19    designed to balance the interests the defendant might

20    have, as well as the government.

21          I would argue, your Honor, in this case we

22    need not reach that point.  There is ample

23    constitutional authority, First Circuit authority

24    expounding upon the limitations through

25    cross-examination and purview of a defendant's right to

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

1    peruse this kind of collateral line of inquiry.  So the

2    government's position is, your Honor, we're asking that

3    your Honor allow the motion to preclude the reference to

4    the Joint Terrorism Task Force, these national security

5    issues, as the case proceeds in order to shield the jury

6    from these distracting, confusing, and potentially

7    highly prejudicial issues to the jurors -- excuse me, to

8    the defendant.

9         It may also help, and I just -- as a practical

10   matter, it may also help to specifically identify to

11   your Honor that this issue may come up with all of the

12   witnesses in the case, whether they be called by the

13   defense or by the government.  And so it really is

14   important not just in dealing with Agent Nevano who was

15   associated with the Joint Terrorism Task Force, but in

16   any witness the defense could go down the line of

17   inquiry saying, "What information did you obtain from

18   the JTTF?"  Or saying you were -- "were you influenced

19   unduly by the JTTF?"  In this case at least two of the

20   charges in the indictment occurred before there was even

21   any JTTF investigation.  The third was a completely

22   consistent response by the defendant, consistent with

23   these previous two false statements.

24        So the government would caution that it could

25   rear its head in any aspect of the case, so we're asking

Page 9

1    for a clear delineation.  Thank you.

2            THE COURT:  Mr. Bongiorni.

3            MR. BONGIORNI:  Judge, with respect to the

4    last part of the government's argument, I got a copy of

5    their brief last evening, and I probably could have

6    saved them the trouble.  It's not my intention to

7    inquire into any witness about the nature of classified

8    information.  And I don't think I ever indicated to the

9    government otherwise.  But this case doesn't happen in

10   the vacuum that the government wants to have the jury

11   examine it in.  That is, they're going to call four

12   witnesses.  They're going to call three people who are

13   from the INS, who were people who interviewed Mr. Hamade

14   about information that he included in a number of

15   different applications.  They go by a particular INS

16   number.  And I don't want the trier of fact in this case

17   to be left with the impression that this was a matter of

18   happenstance because it's quite clear that the moving

19   party behind all of this is the case agent, Agent

20   Nevano, who is behind the scenes instructing some of

21   these individuals with respect to his suspicions about

22   Mr. Hamade that's based on this classified information

23   that he receives.

24            Now, I don't see a reason to get into what the

25   information was, but in terms of us being able to

Page 10

1    contest the thoroughness and the competence and the bias

2    in the government's investigation directed toward him, I

3    think that those are perfectly legitimate avenues of

4    inquiry.  What the government wants the jury to believe

5    is that, out of the blue, in the latter part of December

6    of 2004 when Mr. Hamade, as alleged by the government,

7    is interviewed by an agent in New York when he arrives

8    on a plane from Greece, that somehow the agent just

9    happened to ask him these questions as part of the

10   normal course of events.  And nothing could be further

11   from the truth because the record is replete with

12   evidence that there were a series of phone calls and

13   Agent Nevano did a series of things as part of his

14   occupation in Homeland Security to alert these

15   individuals to the fact that Mr. Hamade was coming and

16   asked that he be intercepted in that regard.

17        So I think it's perfectly legitimate for us to

18   tailor our questions to things like that to expose the

19   fact that there is Agent Nevano who is pulling the

20   strings in the background, even though these witnesses,

21   if left to the government's device, we'd be hamstrung

22   and we couldn't show the jury what was actually going on

23   here.  And we think it's important because it

24   demonstrates the bias on the part of the government's

25   investigation and it also deals with --

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

Page 11

1          THE COURT:  How so?  How does it do that?

2          MR. BONGIORNI:  Well, in this case, Judge, the

3    defense in this case is going to be -- to deny that the

4    marriage ever took place.  And in that regard --

5          THE COURT:  The 1991 marriage.

6          MR. BONGIORNI:  The 1991 marriage.  And in

7    that regard the government has done nothing -- the case

8    agent has done nothing in terms of investigating the

9    bona fidies of that marriage.  That is, they --

10   obviously the government has sent -- had forensic

11   examination of signatures done in this case.  They don't

12   intend to call any witnesses in that regard.  The

13   government hasn't had the -- the case agent didn't cause

14   any interviews of witnesses, people who were allegedly

15   present, or interviewed individuals or called people to

16   be able to testify about that event.  And so what the

17   jury is going to be left with if the government is

18   successful in this motion is we can't show them a full

19   picture of what happened here, including the motivation

20   and the lack of investigation aimed at determining the

21   central issue in the case, which is really was there a

22   valid marriage?

23          THE COURT:  Well, two of the counts --

24          MR. BONGIORNI:  All three of the counts, I

25   believe.

Page 12

1          THE COURT:  Two of the counts are signatures

2     on a form?

3          MR. BONGIORNI:  No.  Two of the counts, Counts

4     Two and Three, and I could look at it in a moment, but

5     under 1546 you can violate the statute two ways:  One is

6     by the making under oath and the other is by the

7     subscription, which I presume to be the execution of the

8     signature.  So what happens first is Count Two relates

9     to the application of the signature; and then when the

10    interview gets done, the interviewer asks the person to

11    affirm under oath a second time that the information

12    under their signature is true.

13         THE COURT:  But in both of those cases, the

14    alleged false statement is written, that is, it's

15    written in the form, and one way of making it is to sign

16    the form and the other way of making it is to say, "Yes,

17    what I have said in the form is true."  Is that right?

18         MR. BONGIORNI:  Right.

19         THE COURT:  So at least as to those, and maybe

20    so I guess that -- your perspective on the case is that

21    those statements, though made, were not false or

22    knowingly false, not that they weren't made?

23         MR. BONGIORNI:  Right.

24         THE COURT:  Okay.  Is that true also of the

25    oral statement?

Page 13

1          MR. BONGIORNI:  The oral statement as best I

2    understand it is the same thing.  It relates to the same

3    statement, but it occurs during an interview.

4          THE COURT:  But, again, your position is that

5    the statement was not knowingly false rather than it was

6    not made.

7          MR. BONGIORNI:  Right.

8          THE COURT:  So you won't be contesting the

9    testimony of witnesses that the statements were made.

10   The evidence will be about whether they were knowingly

11   false, the context will be about whether or not they

12   were knowingly false.

13         MR. BONGIORNI:  And we will be contesting --

14   there's a statement attributed to Mr. Hamade through the

15   agent in New York, and we will be contesting whether

16   those statements were made.

17         THE COURT:  On the reentry.

18         MR. BONGIORNI:  Right.

19         THE COURT:  And which agent is that?

20         MR. BONGIORNI:  That's Agent Bratton.  And

21   that's the agent that, our information is, receives a

22   telephone call from Agent Nevano.  Agent Nevano does

23   certain things in order to alert the authorities in New

24   York to Mr. Hamade's expected return, and when, and has

25   him brought into Customs.  And there are some records

Page 14

1     that deal with telephone calls from a number of

2     individuals back and forth.

3          THE COURT:  Just fill that out a little bit.

4     What was that?  Telephone calls?

5          MR. BONGIORNI:  There are documents that were

6     provided to me as part of the Jencks material last

7     week.  One of them is a lookout notice, and on it are

8     handwritten notations.  I'm not yet sure whose they are

9     but there are -- there is documentary information to

10    reflect the fact that there was contact between the case

11    agent, Agent Nevano, and the New York office prior to

12    Mr. Hamade's return to the United States or

13    contemporaneously with it as a result of -- I forget the

14    acronym the agents use.  In other words, they were able

15    to take his information, punch it into the computer so

16    that there will be a hit if and when they determine he

17    has either left the country or coming back into the

18    country so that one agency can notify the other agency

19    and they can coordinate their activities based on the

20    nature of the investigation.  And that's what we claim

21    occurred here, and we think we have a right to show

22    that.

23          THE COURT:  And what does it -- what does it

24    accomplish, I guess, in this case in your view?

25          MR. BONGIORNI:  From my view?

Page 15

1          THE COURT:  Yeah.

2          MR. BONGIORNI:  Well, it gives the jury a

3   clear picture.  That is, that this wasn't something that

4   occurred by accident.

5          THE COURT:  What wasn't?

6          MR. BONGIORNI:  This interview and this

7   interaction with him.  It was caused.  It was purposeful

8   and it was done for a reason.  And it was important as

9   well.  And in this case, even though all of those

10  things --

11         THE COURT:  Will the government's evidence be

12  that the government suspected prior to the return that

13  the statements were false?

14         MR. CHAKRAVARTY:  The government's evidence

15  will be that on January 10th of 2004, the government had

16  information that the statements were false.

17         THE COURT:  How much before?

18         MR. CHAKRAVARTY:  About six months before.

19  However, your Honor --

20         THE COURT:  After the three statements had

21  been made?  Two of the three.

22         MR. CHAKRAVARTY:  Two of the three statements

23  had been made.  The last one had been made three months

24  before, in September.  But the person who did the

25  interview didn't know that.  The person who did the

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

Page 16

1    interview, this Officer Bratton, was doing a secondary

2    screening as he does routinely.  It was true he was

3    asked to do a secondary screening of this person because

4    of a request.

5         THE COURT:  Did he know -- would he testify if

6    asked that he knew why he was asked to do a secondary

7    screening?

8         MR. CHAKRAVARTY:  He would testify he was

9    asked by Agent Nevano, an immigration agent in Boston;

10   but he wasn't asked the specific scope of the inquiry.

11        THE COURT:  What I'm getting at is will there

12   be any information that will go directly to your point

13   that he was being asked for some reason other than what

14   would appear from the course of the evidence that he was

15   suspected of having made false evidence in the course of

16   his naturalization application?  In other words, if

17   that's -- you think -- you've suggested that the

18   relevance is that there was this undisclosed motivation

19   to target him in some way.

20        MR. BONGIORNI:  Yes.

21        THE COURT:  And I'm asking whether the

22   evidence would permit that inference or whether it would

23   be an equally possible inference on the information that

24   would be available from the witnesses for the jury that

25   he was targeted for a secondary interview because he had

1    already been suspected of making false statements

2    previously.  I don't what the procedures are --

3              MR. CHAKRAVARTY:  As a proffer then.

4              THE COURT:  -- but you're trying to suggest an

5    inference, and it would have to be one that the jury

6    could draw, I guess is my point.  So what makes you

7    think they could draw it?

8              MR. BONGIORNI:  Well, I believe that the

9    situation is this, and I understand what the

10   government's position is with respect to it; but I'm not

11   so sure that this particular agent will not at least

12   during cross-examination be forced to acknowledge that

13   the only reason that he interviewed Mr. Hamade was not

14   because it was his customary practice to do so, but

15   because there was this NTC lookout that was sent to him

16   by the case agent in this case.

17             THE COURT:  And my question is if -- and I

18   don't know whether this is consistent with the way the

19   facts will emerge from the testimony or not, but if it

20   were to be -- appear that the -- that a flagging or a

21   lookout is put on, one of the reasons for doing that is

22   that the person is suspected of having previously made

23   false statements to the immigration authorities; and

24   another might be there's an ongoing investigation;

25   another might be random selection; and another might be

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

Page 18

1    various other reasons.  In order to get any evidentiary

2    value from it from your perspective, you'd have to

3    direct the jury's inference drawing to a better

4    inference over a less good inference.

5              MR. BONGIORNI:  Well, no, as long as it's a

6    permissible inference from the testimony.

7              THE COURT:  That would be speculating,

8    wouldn't it?

9              MR. BONGIORNI:  No, I don't think it would.

10   The witness could answer the question:  "Was one of the

11   reasons that you conducted an interview was because you

12   were requested to do so by the case agent, Mr. Nevano in

13   this case," and taking him through what his normal

14   practices would be.  "And did you receive a

15   communication either in dispatch form or in lookout form

16   prior to him coming there from Agent Nevano?"  That's

17   certainly something that he can say either yes or no to.

18             THE COURT:  All right.

19             MR. BONGIORNI:  And if he says "no," well,

20   then the inquiry is over.  But if he says, "yes and

21   that's what I was relying on" --

22             THE COURT:  Suppose he says yes.

23             MR. BONGIORNI:  When I did that -- and then I

24   think you're allowed to explore with him the extent of

25   his knowledge and what was requested of him, whether or

Page 19

1    not he would have taken it more seriously or less

2    seriously, whether this was something that was -- that

3    he knew was important and what steps he took to ensure

4    that there might be either some record of it or some

5    witness to it because, as I understand, this is the only

6    claimed witness to an oral statement.

7           THE COURT:  Right.  I want to know -- all you

8    want to do is say that when you conducted the interview,

9    you were doing it because some investigator asked you

10   to?

11          MR. BONGIORNI:  Well, yes, and what

12   information --

13          THE COURT:  And did he tell what you his

14   interest was?

15          MR. BONGIORNI:  Did he tell you what his

16   interest was, did he make it known to you, all of that,

17   to make a determination of either how important it was

18   or how -- or maybe it wasn't important at all.  But I

19   mean, I don't know that at this point.  All I've got is

20   the Jencks material, and it's fairly thin to begin

21   with.  But what I see the government doing in this case

22   is, in an effort to keep this within the four corners,

23   is to simply pretend that it was all happenstance and I

24   don't think that was the case.  And I think that would

25   be a false impression that we're entitled to

Page 20

1    illuminate.

2           But, as I said, it's not my intention to get

3    into classified information; but I think that's a

4    two-way sword.  I think if you ask too many questions

5    about whether somebody's the subject of a Joint

6    Terrorism Task Force investigation, you run the risk the

7    jury's going to --

8           THE COURT:  Well, is it possible to pursue the

9    line we just talked about, whether the witness to the

10   oral admission, I guess is the way it would be used,

11   whether the witness to the oral admission had been

12   prompted by an investigator, will it be necessary to

13   identify the investigator's affiliation with that

14   terrorism task force?

15          MR. BONGIORNI:  Not from my point of view.

16          MR. CHAKRAVARTY:  And certainly not from the

17   government's perspective.

18          THE COURT:  So it's just an INS investigator.

19          MR. BONGIORNI:  Right.

20          MR. CHAKRAVARTY:  And I think it's proper.  I

21   think that's what the expected testimony will be.  He

22   didn't know -- the agent that receives the oral

23   admissions doesn't know the substance of that.

24          THE COURT:  Okay.  That's cross-examination of

25   whoever it is, Bratton.

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

Page 21

1          MR. CHAKRAVARTY:  Right.

2          THE COURT:  That's one thing.  The other thing

3    is affirmative evidence from Nevano.

4          MR. CHAKRAVARTY:  Who is not an expected

5    government witness.

6          THE COURT:  I know.  He's on the defendant's

7    list.  To the same point as the conversation with

8    Bratton?

9          MR. BONGIORNI:  Right.

10          THE COURT:  Only?  Only to the conversation

11    with Bratton?

12          MR. BONGIORNI:  Well, it's hard for me to

13    limit myself, Judge, when I haven't seen the evidence

14    unfold.  And obviously if I perceive that I should ask a

15    question in that regard, and I know this is a sensitive

16    issue, I'd request to go to the sidebar and make a

17    request of proffer of what I intend to ask and allow the

18    Court to make a ruling.

19          THE COURT:  Well, let me ask the government.

20    First of all, before I do that -- no, let me do that

21    first.  Bratton is going to testify to an oral statement

22    as to which there will be no other evidence except

23    Bratton's testimony.  The statement the government would

24    offer is offered because it was an admission:  "I was

25    married in Greece" basically.

Page 22

1          MR. CHAKRAVARTY:  And there's some more

2     details there.

3          THE COURT:  Words to that effect.  So it tends

4     to -- it's rather significant in a knowingly false

5     allegation, that he admitted that he had knowledge of

6     his own Greek valid marriage, I guess.  So it's a fairly

7     significant statement.  Why isn't it appropriate to

8     suggest that the person who testifies to the fact of

9     having made the statement can be cross-examined for

10     partiality to a government point of view?

11          MR. CHAKRAVARTY:  I think it is to the extent

12     that he is possessed of any kind of additional

13     information aside from a request, in this case, to

14     provide any information obtained during a routine

15     secondary screening exam of an individual, which the

16     testimony will be he does it scores of times on a daily

17     basis, that what he was aware is this information is

18     going to be passed to Agent Nevano and Agent Nevano has

19     an interest in the case.  He was not asked what

20     questions to ask, he was not told that marriage was even

21     an issue.  Routine questions on a Customs --

22          THE COURT:  Well, that will be a matter for

23     his testimony, what he was asked and what he wasn't

24     asked.  And if it -- if he testifies and the jury

25     believes him that it was simply would you take a good

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

Page 23

1    look at this guy with no other prompting, then not much

2    value to the defendant.  On the other hand, if he says,

3    "Here's a guy we've been" -- take the terrorism out of

4    it -- "here's a guy who is under investigation for

5    making false statements, he says that he was never

6    married, see if you can get him to talk about whether he

7    was married before."  So now you got a guy coming on the

8    stand saying he made a damaging admission to me about

9    his prior marriage.  That's something the jury might

10   want to evaluate.

11          MR. CHAKRAVARTY:  And the government concedes

12   if that was at issue, meaning if there is evidence to

13   that, and I don't think the evidence will bear out that

14   way, it seems like there -- as long as it's limited to

15   the extent of what bias he had when he's collecting this

16   information.  In this case I think that -- and I don't

17   want to prejudice the evidence, but if the agent is not

18   even aware that these particular words are going to be

19   damaging to the defendant --

20          THE COURT:  Right.  And that will be the

21   subject -- who knows what he'll say.  He may say they

22   never had any conversation; and, as I say, there's very

23   little value that accrues to the defendant from it.  I'm

24   not sure we can foreclose him from trying to that

25   limited extent.  We'll stop there for now anyway, and

Page 24

1   we'll have an opportunity after that to see whether

2   Nevano has probative value or worth as a witness in the

3   defense case.  We'll have an opportunity to look at

4   that.

5           MR. BONGIORNI:  I'm not sure, as I said,

6   whether I'd call him.  I asked the government to make

7   him available.

8           THE COURT:  I would limit it to that witness,

9   Bratton, and not to the others.  I don't see any reason

10  because what is significant here for the defense, it

11  seems to me, is the testimony attributing a damaging

12  admission to the defendant, as opposed to testimony

13  about the making of the statements that form the basis

14  for each of the counts.  Those are different matters, it

15  seems to me, and I don't see how the bias argument can

16  work with those when, as you acknowledged, the context

17  isn't the truthfulness that he made the statement,

18  rather it was whether he was doing it knowing that it

19  was false.  So I see a clear distinction between Bratton

20  testifying to the damaging admission on the one hand and

21  other witnesses who might testify to the statements at

22  issue in the --

23          MR. BONGIORNI:  Can I be heard in that regard,

24  Judge?

25          THE COURT:  Sure.

Page 25

1          MR. BONGIORNI:  One of the individuals, I

2    believe it's Toni Swanson -- I'm sorry, Heather

3    Berger -- was apprised prior to the oral part of the

4    interview after the N-400 document was submitted about

5    the existence of the prior marriage.  And I would like

6    to be able to inquire of her whether or not she was

7    provided by Agent Nevano a copy of this so-called Greek

8    marriage certificate prior to the interview.  Now, I

9    don't think that that calls for an inquiry into

10    terrorism or anything else.

11          THE COURT:  Do you have any problem with that,

12    whether she'd seen that?

13          MR. CHAKRAVARTY:  Your Honor, this seems like

14    a reasonable line of inquiry.  My only caution on both

15    Berger and Bratton is how counsel goes down that road.

16    It's one thing to say this is the scope of the inquiry,

17    but how he characterizes Nevano and that relationship is

18    significant in terms of not casting an unfair dispersion

19    on the defendant.  So the government's proposal in that

20    sense is:  "Are you familiar with Immigration and

21    Customs Enforcement Agent Nevano, and did you have a

22    conversation with him" as opposed to characterizing it.

23          THE COURT:  Agreed?

24          MR. BONGIORNI:  I agree to proceed carefully,

25    Judge.  And I'm aware of the Court's rulings, and I will

Page 26

1    do my level best to abide by them.  As I said, if I

2    think the state of the evidence indicates I should have

3    some latitude before asking the question, I always place

4    the matter before the Court at sidebar and let the Court

5    make a ruling one way or another.

6            THE COURT:  Okay.

7            MR. BONGIORNI:  I have some -- I have some

8    requests orally.  I know Miss West and I talked about it

9    and she gave me a copy of the government's request for

10   some proposed voir dire questions and I joined in her

11   request, but I would ask the Court to include another

12   question to the jurors about whether or not anybody has

13   any feelings about people who are of the Islamic faith

14   that would prevent them from making a fair and impartial

15   determination in this case because I presume that that's

16   going to come out.

17           THE COURT:  Will there be evidence of the

18   defendant's faith?

19           MR. BONGIORNI:  I think there will be during

20   his testimony to describe the relationship --

21           THE COURT:  Of the marriage?

22           MR. BONGIORNI:  -- between him and why there

23   was no marriage.  I think as part and parcel of that, I

24   expect that he's going to testify that in the village

25   that he was during 1991, that he was advised to keep his

94e4c52c-4e49-4e1e-9e6f-74227af86c7d

1    religious background a secret, so forth and so on.  So I

2    do expect that to be -- and because all of the

3    documentary evidence that's going to come in shows his

4    Lebanese passport and writing in Arabic and things of

5    that nature, I'd ask the Court to make that inquiry.

6              THE COURT:  Okay.  I guess I'll ask.

7              MR. CHAKRAVARTY:  Your Honor, if I may, in our

8    proposed voir dire questions, we did propose in question

9    three, if you have that in front of you, do you have any

10   opinions whether religious faith, generally without

11   specifying, should have any effect.  That was part of

12   our intent to cover that.

13             THE COURT:  Okay.  I can tell the jurors that

14   this is likely to be a three-or-four-day trial?

15             MR. BONGIORNI:  I think two days.

16             THE COURT:  I like to surprise them pleasantly

17   rather than the other way around.

18             MS. WEST:  Then I think that's safe.

19             THE COURT:  I might say it will probably be

20   concluded before the end of the week or something like

21   that.  Is that fair?

22             MR. BONGIORNI:  Right.

23             MS. WEST:  Right.

24             THE COURT:  Even with the shortness of the

25   trial, I think we should have some alternates, I guess.

94e4c52c-4e49-4e1e-9e6f-74227af86c7d